

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED101585 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Perry County |
| v. | ) | 12PR-CR00659-01 |
| | ) | |
| | ) | Honorable Benjamin F. Lewis |
| AARON AMSCHLER, | ) | |
| | ) | |
| Appellant. | ) | Filed: June 2, 2015 |

### Introduction

Aaron Amschler (Defendant) appeals the judgment entered upon his conviction by jury of one count of unlawful use of a weapon for discharging a firearm while intoxicated in violation of Section 571.030.1(5).[1]  He argues the trial court erred in refusing to instruct the jury regarding self-defense.  Because we agree that the evidence, when viewed in the light most favorable to Defendant, warranted submission of a self-defense instruction, we reverse.

---

[1] All statutory references are to RSMo. (2000), unless otherwise indicated.

## Background

On the morning of December 11, 2012, Defendant was at his father's house. His father, Gary Amschler (Gary),[2] received a phone call that morning from Laura Adams (Adams), who said that Clinton Chandler (Chandler) was on his way over to Gary's house. Adams told Gary that Chandler was enraged and had said Defendant "better not be there" and that he would beat up Defendant.

Gary testified he was concerned about this because he knew Chandler "was a dangerous guy." He explained that two months earlier, Defendant was standing at the back of a truck and told Chandler not to back up, but Chandler drove backwards and ran over Defendant's leg with the truck. Later that night, Chandler was at Gary's house, and Defendant asked Chandler why he ran over his leg. Chandler responded by punching Defendant in the face, which knocked Defendant to the ground.

So, when Chandler and his wife Barbara Chandler (Barbara) arrived at Gary's house on December 11, 2012, Gary met them outside. He stopped Chandler in the driveway, told him not to come any further, and ordered him to leave. Chandler refused to leave and demanded payment from Gary for landscaping work Chandler had done for Gary. Barbara testified Gary and Chandler were saying "horrible things" to each other, and that Chandler was cussing and threatening to hurt Gary. Chandler said "if I catch you out by yourself, old man, you're going to pay me one way or another" and said he was going to "kick [his] ass." Gary testified that Chandler spent 45 minutes standing in the road bordering Gary's property, and he also made threats toward his family including "I'll kill you. I'll kill your kids. I'll burn both your houses." Then Chandler got into his

---

[2] Because this case involves multiple individuals with the same last name, we refer to some of them by first name. We do so for the sake of clarity only and intend no disrespect.

2

car and drove halfway up Gary's long driveway. Chandler and Gary continued arguing. Gary testified that Chandler was speaking "over the roof [of his truck] so I didn't know what he had." Chandler said he might have also clenched his fist and waved it at Gary.

At some point during this encounter, Gary went into his house and woke up Defendant, who had been sleeping. Gary told Defendant that Chandler was making threats and that Defendant should get his gun. Defendant emerged briefly from the house and then went back inside. Chandler testified he got into his car and started to back out of the driveway before stopping and continuing to argue with Gary. In the meantime, Defendant came back out of the house with a rifle in his hand. Gary testified that "[Chandler] got out and stepped around the car and started running at [Defendant] at about two hundred and fifty feet and then he stopped and said 'Come over here and fight. I'll kill you. I'll kill your dad. I'll kill your brother. I'll burn your truck.'"

While the yelling continued, Defendant fired a shot from the rifle into the ground. Defendant testified that he was afraid of Chandler because of what Chandler had done to him previously, and he also knew Chandler did some work as a tree-trimmer and would likely have a gas jug in the back of his truck for refueling chainsaws. Defendant said he was scared of Chandler, knew him to be violent, and did not want to take a chance of letting Chandler burn down Gary's house.

The evidence at trial varied as to how far away Chandler was from Defendant when Defendant fired the gun, ranging from 75 to 250 feet, but Barbara testified that Chandler was "definitely on the Amschler property when the gun was fired." Defendant did not see that Chandler had a weapon at any time. Both Defendant and Barbara testified that after Defendant fired the gun, Chandler did not leave but continued yelling

3

at Gary and Defendant and making threats. Eventually, Chandler and Barbara left, and both Chandler and Defendant called the police.

When police arrived, they detected an odor of alcohol on Defendant's breath. Defendant admitted firing the gun. He told police he was afraid of Chandler and he fired the gun to defend himself. When Defendant was in custody, he provided a breath sample to police showing a blood alcohol content of .107.[3]

The State charged Defendant as a prior offender with unlawful use of a weapon for discharging a firearm while intoxicated. At the close of the evidence, Defendant offered a self-defense jury instruction, which the trial court rejected. The trial court found that no substantial evidence supported the giving of that instruction because the evidence did not support a reasonable belief of Chandler's use or imminent use of unlawful force. During their deliberation, the jury asked the trial court whether they needed to consider self-defense, and the trial court told them to be guided by the court's instructions. The jury found Defendant guilty. The trial court sentenced Defendant to three years' imprisonment, but suspended execution of that sentence and placed him on five years' probation. This appeal follows.

## Discussion

In his first point, Defendant argues that the trial court erred in refusing to instruct the jury regarding self-defense because there was substantial evidence from which the jury could have found that he fired the gun under a reasonable belief of imminent danger. We agree.

---

[3] While Defendant does not contest the element of his intoxication, he testified at trial that he drank a beer after firing the shot and before police arrived.

4

As a threshold matter, the State argues Defendant failed to preserve this point for review because the self-defense instruction Defendant proffered at trial misstated the law. Failure to submit a corrective instruction may leave a claim of instructional error unpreserved. See State v. Derenzy, 89 S.W.3d 472, 475 (Mo. banc 2002). However, regarding self-defense, where substantial evidence in the record shows that a party has injected the issue of self-defense into the case, the trial court is required to instruct the jury on self-defense, "even if such an instruction was offered but not in proper form." State v. Westfall, 75 S.W.3d 278, 281 n.9 (Mo. banc 2002). Thus, even assuming *arguendo* Defendant's proffered instruction misstated the law, it was the trial court's and not Defendant's duty to correct any errors. See id. Any failure of Defendant to do so did not defeat preservation of this point for appeal.

Turning to the merits of Defendant's claim, we review a trial court's refusal of a requested jury instruction *de novo*. State v. Jackson, 433 S.W.3d 390, 395 (Mo. banc 2014). The trial court is required to instruct the jury regarding self-defense if there is any substantial evidence putting self-defense in issue. Westfall, 75 S.W.3d at 280-81. In determining whether substantial evidence existed to require such an instruction, we view the evidence and reasonable inferences therefrom in the light most favorable to Defendant and "the theory propounded by [D]efendant." Id. at 280. While the substantial evidence required could have come from Defendant's testimony alone, the trial court's obligation to instruct the jury remained even if the substantial evidence supporting the instruction was inconsistent with Defendant's testimony. See id. Where a trial court is required to instruct the jury regarding self-defense, failure to do so constitutes reversible error. State v. Weems, 840 S.W.2d 222, 226 (Mo. banc 1992).

5

A defendant may be justified in using physical force when "he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force" by another person. Section 563.031.1, RSMo. (Supp. 2013). The use of deadly force requires in addition that the defendant "reasonably believe[] that such deadly force is necessary to protect himself, or herself . . . or another against death, serious physical injury, or any forcible felony." Section 563.031.2(1), RSMo. (Supp. 2013). A reasonable belief is one "based on . . . grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared[,] not . . . upon whether the belief turned out to be true or false." State v. Smith, --- S.W.3d ---, No. SC94313, 2015 WL 1094826 (Mo. banc Mar. 10, 2015) (quoting MAI-CR ed 306.06A[6]).

The question here is whether there was substantial evidence from which the jury could have found that Defendant had a reasonable belief deadly force[4] was necessary to defend himself from what he reasonably believed to be an imminent use of unlawful force by Chandler. Section 563.031.1. The reasonableness of Defendant's belief itself was for the jury to determine. State v. Chambers, 671 S.W.2d 781, 783 (Mo. banc 1984).

In rejecting Defendant's proposed self-defense instruction, the trial court noted that Chandler was a considerable distance away from Defendant, did not possess a weapon, and made no attempt to strike Defendant, and therefore concluded there was no evidence that any threat of force from Chandler was imminent. However, viewing the whole record in the light most favorable to Defendant, we conclude there was substantial evidence warranting submission of the issue to the jury.

---

[4] Defendant did not dispute that firing a shot into the ground was a use of deadly force.

6

First, Chandler acknowledged that he was there to "force them to do the right thing," and Barbara heard him tell Gary he would get his money "one way or another." Once Defendant was outside, there was evidence Chandler ran toward Defendant saying he would kill him, kill his family, and burn his truck and house. While there was testimony that Chandler never got closer than 75 feet from Defendant and was not holding a weapon, Defendant's testimony about both the contents of Chandler's truck and the truck itself could have supported a reasonable belief that Chandler would use either to cause imminent harm.

For instance, Defendant testified that, knowing of Chandler's employment, Defendant believed Chandler would have a gas jug in his truck that he could use to set fire to the house. Moreover, in light of the evidence that Chandler had used a truck in the past to injure Defendant, a jury may have found it reasonable that Defendant could believe Chandler's truck itself was a potential weapon, and one that could quickly close the distance gap between Chandler and Defendant. Additionally, Defendant testified that on a scale of one to ten, his fear of Chandler was "[e]leven, ten." Under these circumstances, we believe the jury should have been able to determine in light of all the evidence how close Defendant had to let Chandler get to him before Defendant was justified in firing a warning shot.

Next, after Defendant fired the shot, he saw "[Chandler] c[o]me walking towards me towards the house . . . ." Similarly, Barbara testified that Chandler was on Gary's property and did not leave even after Defendant fired the gun, which could lend to confirmation of a reasonable belief on Defendant's part that Chandler had no intention of leaving without causing the harm he was threatening. There was evidence that Defendant

7

was standing only a few feet from his front door and arguably had no place to retreat without risking Chandler coming closer to or inside his home to carry out his threats.[5] The jury should have been given the opportunity to consider whether this evidence formed a reasonable belief on Defendant's part that there was an imminent threat of unlawful force.

Additionally, there was evidence of Chandler's prior violent behavior toward Defendant and others. Specifically, two months before this incident, Chandler ran over Defendant's leg with a truck and then punched Defendant in the face when he later asked Chandler about it. This evidence was relevant to establish the reasonableness of Defendant's belief that the use of deadly force was necessary. See State v. Waller, 816 S.W.2d 212, 216 (Mo. banc 1991); State v. Peoples, 621 S.W.2d 324, 327 (Mo. App. W.D. 1981) (acts of violence by victim upon defendant may prove reasonableness of defendant's apprehension).

The jury also heard evidence of Chandler's reputation for violence, and Defendant testified that he had seen Chandler hurt other people in fights. In one of these instances, Defendant said Chandler believed the person owed him money and Chandler "knocked his teeth crooked in his mouth." In light of the fact that Chandler was also at Gary's

---

[5] Defendant argued that the castle doctrine, codified in Section 563.031.2, was also an appropriate basis for a self-defense instruction here, and in fact his proffered instruction included castle doctrine language. While such an analysis is unnecessary where there is evidence for the traditional basis for self-defense and here the evidence did not establish the castle doctrine applied, the facts here do raise the question of what the legislature intended when it amended this statute in 2010. Under the amended Section 563.031.2(2), there must be evidence that Chandler unlawfully entered a *dwelling or residence* that Defendant lawfully occupied, which was not the case here. The evidence here showed Defendant stood a few feet from his front door, and that Chandler remained on the property but outside the house throughout the encounter. Under subsection (3), deadly force may be used against a person unlawfully entering or remaining on *private property*, but only the owner or lessee of the property is justified in using such force. The evidence here does not establish that Defendant co-owned or leased his father's house, but it raises the question of whether the legislature intended to exclude a family member of the owner of private property, who lives on the property but is not listed on the deed, from justifiably defending the property from trespassers under this section.

8

house that day to collect money he believed Gary owed him, the jury should have had an opportunity to consider whether this evidence contributed to a reasonable belief that an imminent threat of unlawful force existed.[6] See State v. Gonzales, 153 S.W.3d 311, 312-13 (Mo. banc 2005) (evidence of victim's reputation for violence is relevant to issue of reasonableness of defendant's fear of victim where defendant knew of victim's reputation).

Defendant's counsel also elicited evidence of Chandler's prior convictions. Chandler admitted at the time of trial he was incarcerated for felony domestic assault, arising out of an event that occurred on December 12, 2012, the day after this incident. Chandler also had prior convictions for stealing, various drug-related offenses including felony distribution, as well as three other assault convictions.

Finally, self-defense was Chandler's entire theory of defense. In fact, both the State and Defendant's counsel discussed the issue of self-defense with the jury during opening statements and both attorneys asked Defendant questions regarding self-defense during his testimony. Further, the jury inquired during deliberations whether they could consider self-defense.

Viewing all of these circumstances in the light most favorable to Defendant and to his theory of the case, we conclude the trial court erred in determining that there was no substantial evidence on the record from which the jury could find that Chandler approached Defendant in a manner that Defendant could reasonably have believed posed an imminent threat of unlawful force, requiring the use of deadly force in defense. See

---

[6] Defendant's counsel also sought to introduce evidence that Chandler had a reputation for violence when he was looking for drugs, and that Chandler was in fact looking to obtain money for drugs on the day when he came to Defendant's father's house. The trial court excluded this evidence, but the trial court should reexamine this question upon retrial in light of the fact that self-defense will be at issue. See State v. Gonzales, 153 S.W.3d 311, 312-13 (Mo. banc 2005).

9

Westfall, 75 S.W.3d at 280-81. While a jury may ultimately find Defendant did not act in self-defense, it is up to a jury to decide which evidence they find credible and whether Defendant's fear was reasonable. See State v. Jackson, 433 S.W.3d 390, 399 (Mo. banc 2014) (jury has right to disbelieve all or any part of evidence, and refuse to draw needed inferences).

Thus, the trial court committed reversible error in refusing to instruct the jury regarding self-defense. Point granted.[7]

## Conclusion

Defendant sufficiently injected the issue of self-defense such that the trial court should have instructed the jury that they could consider whether Defendant's actions were justified under the circumstances. Thus, we reverse the trial court's judgment and remand for a new trial.

Gary M. Gaertner, Jr., Judge

Robert G. Dowd, Jr., J., concurs.
Kurt S. Odenwald, P.J., dissents in a separate opinion.

---

[7] Defendant's second point contests the trial court's exclusion of statements Defendant made during a 911 call following this incident. Because Defendant sought to introduce this evidence to bolster his defense of self-defense, which will now be at issue upon retrial, and because admission of evidence is a matter for the trial court's discretion, we leave it to the trial court upon remand to determine at that point whether this evidence should be admitted.



# In the Missouri Court of Appeals

## Eastern District

### DIVISION III

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101585 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Perry County |
| vs. | ) | |
| | ) | Honorable Benjamin F. Lewis |
| AARON M. AMSCHLER, | ) | |
| | ) | |
| Appellant. | ) | FILED:   June 2, 2015 |

#### Dissent

Appellant Aaron Amschler ("Aaron")[1] appeals the judgment and sentence entered upon a jury

verdict finding him guilty of one count of unlawful use of a weapon for discharging a firearm while

intoxicated in violation of Section 571.030.1(5).[2]  I would affirm the trial court's judgment because

the record lacks substantial evidence of an imminent or immediate danger required to support a jury

instruction based upon self-defense.  I agree with the trial court's refusal to instruct the jury on self-

defense and respectfully dissent from the majority opinion.

This case arises from an altercation between Aaron, Aaron's father ("Gary"), and Clinton

Chandler ("Chandler").  The majority opinion adequately describes the nature of the dispute and

---

[1] Because Aaron Amschler and his father Gary share the same last name, I will refer each of them by first name. I intend
no disrespect to the parties in doing so.
[2] All statutory references are to RSMo. 2000.

altercation between the parties. The argument was over money Chandler claimed was due him by Gary for landscaping work performed by Chandler. There is no dispute that Chandler came onto Gary's property in an aggressive and belligerent manner demanding payment and making threats against Gary, Gary's family, Aaron, and Gary's property should Chandler not receive the payment Chandler claimed was due. Chandler drove onto Gary's property in his truck. Chandler got out of his truck and approached Gary. The argument became heated. At some point, Chandler got back into his truck and started to back out of the driveway. Chandler then again got out of the truck and continued arguing with Gary. Aaron then came out of the house with a rifle and fired into the ground. Chandler continued to argue and left the Amschler property shortly thereafter.

This situation involves a potentially deadly combination—alcohol and firearms. The evidence showed Aaron had an elevated blood alcohol content of .107 after being taken into custody. Aaron was charged as a prior offender with unlawful use of a weapon for discharging a firearm while intoxicated. Aaron claimed to have acted in self-defense due to Chandler's aggression. Acting in self-defense removes the act of discharging a firearm while intoxicated from the criminal proscription of Section 571.010.1(5).

As noted by the majority opinion, we review a trial court's decision whether to give a requested jury instruction *de novo*. State v. Jackson, 433 S.W.3d 390, 395 (Mo. banc 2014). A defendant is entitled to an instruction on any theory that the evidence and the reasonable inferences therefrom tend to establish. Westfall, 75 S.W.3d at 280. Critical to my analysis is the defendant's burden of injecting the issue of self-defense into his case by substantial evidence. State v. Powers, 913 S.W.2d 138, 141 (Mo. App. W.D. 1996). I am not persuaded that Aaron has carried this burden.

Self-defense is a person's right to defend himself or herself against attack. Hendrix v. State, 369 S.W.3d 93, 98 (Mo. App. W.D. 2012). The right is codified in Section 563.031, which

2

authorizes a person to use physical force upon another person "when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself… from what he or she reasonably believes to be the use or *imminent use* of unlawful force by such other person." Id.; Section 563.031.1 (emphasis added). In order to justify the use of deadly force in self-defense, four elements must be present: (1) an absence of provocation or aggression on the part of the defender; (2) a reasonable belief that deadly force is necessary to protect himself or herself against an *immediate danger* of death, serious physical injury, rape, sodomy, or kidnapping or serious physical injury through robbery, burglary or arson; (3) a reasonable cause for that belief; and (4) an attempt by the defender to do all within his or her power consistent with his or her own personal safety to avoid the danger and the need to take a life. State v. Edwards, 60 S.W.3d 602, 612 (Mo. App. W.D. 2001) (emphasis added). The third element is viewed from the circumstances as they appeared to the defendant. Id. However, the reasonableness of the belief itself, the second element, is determined by an objective test that measures conduct based on what a hypothetical ordinary, reasonable, and prudent person would have believed or how they would have reacted. Id.

Aaron fired a rifle, which constitutes the use of deadly force. Accordingly, to be entitled to a self-defense instruction, Aaron was required to present evidence that he had an objectively reasonable belief that deadly force was necessary to protect himself against an *immediate danger* of death, serious physical injury, or serious physical injury through robbery, burglary or arson. In rejecting Aaron's proposed self-defense instruction, the trial court concluded that no evidence had been presented showing the imminent threat of force by Chandler. In particular, the trial court noted that Chandler was a considerable distance away from Aaron, did not possess a weapon of any kind, and made no attempt to strike Aaron. I am mindful that the evidence supports a finding that Chandler threatened the use of force against both Aaron and his family, and that Aaron was afraid of Chandler

3

given Chandler's recent past conduct. And I do not dispute that Chandler was the initial aggressor and acted in a generally threatening manner. But the law of self-defense is clear that Aaron may not rely upon self-defense as a means of exoneration under Section 571.030.1(5) unless he reasonably believed there was an *imminent danger* that Chandler would use unlawful force against him. I disagree with the majority opinion that the record contains sufficient evidence of any imminent or immediate danger to Aaron that justified his discharge of a loaded rifle while drunk. Aaron himself best characterizes the events of that day as Chandler "[j]ust standing there whooping and hollering on our property." Without question—the whooping and hollering was aggressive and threatening in tone and words. But in the end, Chandler's conduct that day was nothing more than words.

My dissent is premised upon the well-established law in Missouri that mere words, without some accompanying action, do not justify the exercise of self-defense. See State v. Finley, 150 S.W. 1051, 1054 (Mo. 1912); State v. Bongard, 51 S.W.2d 84, 88 (Mo. 1932). Rather, self-defense "requires a real, specific, actual and immediate threat of bodily violence to which the defendant's actions are an appropriate and proportional response." State v. Harris, 870 S.W.2d 798, 809-10 (Mo. banc 1994). I do not minimize the anxiety Aaron may have had with regard to Chandler in light of their past history. And while Chandler's actions were without question disquieting and disturbing, we must be guided by whether the record contains substantial evidence that Aaron had an objectively reasonable basis to believe that Chandler posed an *imminent* threat of unlawful force at the time he fired his rifle. The evidence, when viewed in the light most favorable to Aaron, showed that: Chandler verbally threatened to kill Aaron and Gary and cause property damage; both Aaron and Gary were afraid of Chandler during the altercation; Chandler had backed a truck over Aaron's leg and punched Aaron in the head two months before the altercation; Chandler never displayed a weapon of any kind; Chandler never stated that he had a weapon of any kind; Aaron did not believe

4

Chandler had a weapon; Chandler never struck or attempted to strike either Gary or Aaron; and Chandler was at least 75 feet from Aaron, and according to Aaron was about 250 feet away from him when Aaron fired the rifle.[3] I do not at all minimize Chandler's display of aggression that day—but invoking self-defense requires more than verbal aggression. In the final analysis, when reviewing all of the evidence, and giving the defendant every reasonable inference, I find this evidence insufficient to show an imminent or immediate danger to Aaron or Gary. When reduced to its most basic component, the events occurring before Aaron shot his rifle were nothing more than words; again as best described by Aaron, Chandler was "[j]ust standing there whooping and hollering on our property."

The majority opinion voices concern that self-defense was Aaron's "entire theory of defense" and that counsel for both Aaron and the State discussed the issue of self-defense during opening statements. Without question, Aaron's defense was significantly impacted by the trial court's refusal to instruct on self-defense. But the damage to Aaron's case was not caused by the trial court's ruling on the self-defense instruction. Rather, Aaron's theory of defense was undermined by Aaron's failure to sustain his burden of injecting the issue of self-defense through substantial evidence. I am concerned that the majority opinion will open the floodgates for claims of self-defense in any case where vehement and threatening verbal arguments occur between persons having a prior aggressive history with each other. How might the holding of the majority opinion impact the use of self-defense in cases of domestic or gang violence, where prior history and relationships are often coupled with aggressive or violent incidents? Might the majority opinion be different had Aaron shot and killed Chandler instead of firing into the ground? The trial court found insufficient evidence to

---

[3] The majority opinion notes that Aaron testified that he believed Chandler might have a jug of gas in his truck, giving some credence to Chandler's threat of burning down Gary's house. And the majority posits that a jury might have found it reasonable that Chandler might again use his truck as a weapon against Aaron. I seriously question both of these scenarios. There was no evidence that Chandler either had a gas can in his possession or suggested to Aaron that he had a gas can. There was no evidence that Aaron saw any gas can or based his suspicion on anything other than the fact that Chandler worked as a tree trimmer. Moreover, the evidence was uncontradicted that Chandler retreated somewhat and moved his truck even further away from Gary and Gary's home after his initial intrusion and before Aaron fired the rifle.

5

support a self-defense instruction. I fear that requiring the trial court to submit a self-defense instruction to the jury on the facts before us substantially and unwisely lessens the standards required for such instruction, and may very well lead to unintended detrimental consequences.

Kurt S. Odenwald, Presiding Judge

6